Terry Appeal.
McKeiver Appeal.

340

Argued January 28, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Irene H. Cotton,* with her *Charles H. Baron* and *Harvey N. Schmidt,* for appellant.

*Daniel E. Farmer,* with him *Charles H. Baron* and *Harvey N. Schmidt,* for appellant.

*Arlen Specter,* District Attorney, with him *James D. Crawford,* Deputy District Attorney, and *Richard A. Sprague,* First Assistant District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, May 4, 1970:

Joseph McKeiver[1] and Edward Terry[2] are juvenile delinquents, having acquired that status upon findings

---

[1] In May of 1968 appellant Joseph McKeiver, then sixteen years old, was charged with robbery, larceny and receiving stolen goods in a juvenile delinquency petition. The essence of the charge was that he and some twenty or thirty other youths had taken some twenty-five cents from three young teenagers. At the time the charges were brought against him, appellant had never before been arrested and had a record of gainful employment.

When McKeiver's case was called for trial on October 17, 1968, his counsel advised the court that he had not had an opportunity to discuss the case with his client and was therefore unable to proceed. The court gave counsel five minutes to talk with his client and then proceeded to hear the case. Counsel requested and was denied the right to a jury trial.

The Commonwealth's evidence consisted of the testimony of two of the three alleged victims, who gave the following narrative of events. While they and a companion were playing in Fairmount Park, they suddenly realized that they were being pursued by some twenty or thirty boys on foot and by three boys on bicycles. Two of the boys who were on bicycles remained at a distance while the third approached the three victims. What the small army of robbers on foot did at this point is unclear, but the remaining boy on a bicycle demanded money. One of the three victims refused, was punched and gave the thief a quarter. The bandit then rode off and the three victims were taken to a park guard station by a passing motorist where, after a few minutes of preliminary questioning, the two witnesses were placed in a patrol car and taken for a ride around the area. Within minutes the two victims spotted someone whom they thought was the boy who robbed them— that person turned out to be Joseph McKeiver.

The testimony given by the two alleged victims at the hearing was weak. One described the robbery as a gang effort while the other testified that the thief acted alone. Both stated that the robber did not have on glasses, but McKeiver has worn them since childhood. One testified that the robber gave his bicycle to another *and* that the robber rode a bicycle away from the robbery, and was riding one when arrested. Both said that the robber rode a bicycle throughout the event, and yet one stated that he identified the robber by his distinctive walk.

After the evidence was given, counsel for McKeiver made an argument to the trial judge similar to that usually made to a

by the Juvenile Court of Philadelphia that each had violated a law of the Commonwealth.[3] The Superior Court affirmed the adjudications per curiam and we granted allocatur. Their consolidated appeals raise a single question: whether there is a constitutional right to a jury trial in juvenile court.

Appellants argue that the Constitution of the United States, especially as interperted by *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428 (1967) and *Duncan v. Louisiana*,

jury; the story of the alleged victims was incredible, the eyewitness identification of children is unreliable, and the facts had not been proved beyond a reasonable doubt. The judge was apparently unimpressed by these efforts; he found McKeiver to be a "delinquent child" and placed him on probation. McKeiver applied for a rehearing alleging that the court had erred in refusing him the right to a trial by jury. The petition was denied and the Superior Court affirmed *per curiam*, without opinion.

[2] Edward Terry was adjudged a juvenile delinquent on March 27, 1969, in proceedings initiated by petition. The evidence tended to show that one Officer Sweeney, of the Park Guard, happened upon a fight in the park and that when he ordered the combatants to break up, two of the observers to the fight hit him with fists and with a stick. Sweeney was apparently not injured. Later that same day Sweeney saw the two boys who had attacked him. Sweeney ordered them to halt, which they did. Apparently Sweeney then grabbed Terry about the neck, but he escaped and ran away. The next day Sweeney again saw Terry on the street and, after a chase, caught and arrested him. Terry testified that Sweeney beat him at the time of the arrest.

Terry's case was first called on January 20, 1969. At that time counsel for Terry indicated that he wished to have a jury trial and the matter was continued. The hearing was finally held on March 27, 1969, at which time counsel for Terry reiterated his request for a jury trial, which was denied. Terry was found to be a delinquent and was committed to the Youth Development Center at Cornwells Heights.

[3] "(4) The words 'delinquent child' include: (a) A child who has violated any law of the Commonwealth or ordinance of any city, borough or township; . . ." Act of June 2, 1933, P. L. 1433, 11 P.S. §243.

391 U.S. 145, 88 S. Ct. 1444 (1968), gives them the right to insist on a jury trial. We cannot agree.

For over sixty-five years the Supreme Court gave no consideration at all to the constitutional problems involved in the juvenile court area.[4] Then came the landmark decision in *In re Gault*.[5] The decision is somewhat of a paradox, being both broad and narrow at the same time. It is broad in that it evidences a fundamental and far-reaching disillusionment with the anticipated benefits of the juvenile court system: "[T]he highest motives and most enlightened impulses led to a peculiar system for juveniles, unknown to our law in any comparable context. The constitutional and theoretical basis for this peculiar system is—to say the least—debatable. And in practice, as we remarked in the *Kent* case, supra, the results have not been entirely satisfactory. Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure. . . . The absence of substantive standards has not necessarily meant that children receive careful, compassionate, individualized treatment. The absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures. Departures from established principles of due process have frequently re-

---

[4] "The original juvenile court act of Illinois, a model quickly followed in almost every state, was approved by the governor of Illinois on April 21, 1899. Until March 21, 1966, the Supreme Court had never passed upon the legality of juvenile court procedures or of police practices respecting juveniles." Paulsen, *Kent v. United States: The Constitutional Context of Juvenile Cases*, 1966 Supreme Court Review 167 (1966).

[5] *Gault* was presaged by *Kent v. United States*, 383 U.S. 541, 86 S. Ct. 1045 (1966), although the narrow issue involved in *Kent* concerned the nature of the requirements for a valid waiver of the Juvenile Court of the District of Columbia's "exclusive jurisdiction."

sulted not in enlightened procedure, but in arbitrariness."[6]

Continuing to paint with a broad brush, the Court announced its intention to require that the juvenile courts function with "the procedural regularity and the exercise of care implied in the phrase 'due process.' "[7] At this point, however, the Court narrowed the focus of its decision and quoted from its earlier holding in *Kent*, saying: " 'We do not mean . . . to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment.' We reiterate this view, here in conjunction with a juvenile court adjudication of 'delinquency,' as a requirement which is part of the Due Process Clause of the Fourteenth Amendment of our Constitution."[8]

The Court then specifically enumerated four due process rights which it held applicable in juvenile proceedings: (1) the right to adequate and timely notice of the charges; (2) the right to counsel; (3) the right to confrontation and cross-examination; and (4) the privilege against self-incrimination. Additionally, a majority of the Court specifically declined to rule on

---

[6] *In re Gault*, 387 U.S. 1, 17-19, 87 S. Ct. 1428, 1438-39 (1967).

[7] 387 U.S. at 27-28, 87 S. Ct. at 1444:

"Due process of law is the primary and indispensable foundation of individual freedom. It is the basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the state may exercise. . . . [T]he procedural rules which have been fashioned from the generality of due process are our best instruments for the distillation and evaluation of essential facts from the conflicting welter of data that life and our adversary methods present. It is these instruments of due process which enhance the possibility that truth will emerge from the confrontation of opposing versions and conflicting data." 387 U.S. at 20-21, 87 S. Ct. at 1439-40.

[8] 387 U.S. at 30-31, 87 S. Ct. at 1445, citations omitted.

two other rights; the right to a transcript and the right to appellate review.

As can be seen from the quoted language, we are confronted with a sweeping rationale and a carefully tailored holding. If we had only the broader language it would be difficult to resist the conclusion that the Supreme Court had concluded that juvenile courts must comply with *all* the requirements of due process. The holdings do not, however, seem to contemplate so large a result, and our task is to decide whether the right to a jury trial ought to be operative in the juvenile court under the reasoning of *Kent* and *Gault* or under our own reading of the Constitution.

Appellants argue that the Supreme Court's 1968 decision in *Duncan v. Louisiana*, 391 U.S. 145, 88 S. Ct. 1444 (1968), is useful in the quest for a determination of what ought to be included in the bundle of due process rights properly applicable in juvenile courts. The Supreme Court there held that the "Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee."[9] Again, the Court spoke in sweeping language, calling the right to trial by jury fundamental to our system of justice, and installed the right to a jury trial as one of those protections in the Bill of Rights which is fully applicable as a restraint on state conduct.

But *Duncan* also contained language which indicates that the ruling is not necessarily controlling here. In a discussion of the proper standards for "incorporation," the Court indicated that a new standard had been operating in recent cases. No longer was the inquiry to focus on whether *some* civilized system of justice could be constructed without utilization of a particular safeguard. Realizing that every state in the union

---

[9] 391 U.S. at 149, 88 S. Ct. at 1447.

operated under highly similar versions of the Anglo-American common law system, the Court declared that incorporation was appropriate whenever a particular procedure was fundamental to this kind of a legal system—"whether, that is, a procedure is necessary to an Anglo-American regime of ordered liberty."[10] The Court then enumerated those protections in the Bill of Rights which had recently been made applicable to the states, and concluded that of each "it might be said that the limitation in question is not necessarily fundamental to fairness in every criminal system that might be imagined but is fundamental in the context of the criminal processes maintained by the American States."[11] Referring specifically to the right to trial by jury, the Court stated that a "criminal process which was fair and equitable but used no juries is easy to imagine. It would make use of alternative guarantees and protections which would serve the purposes that the jury serves in the English and American system."[12]

In addition to the above stated restriction on the absolutism of *Duncan,* we must also consider the narrower portions of *Gault's* holdings, remembering that the Supreme Court specifically refused to apply the totality of the due process procedural safeguards to juvenile courts. Keeping these restrictions in mind, we can now determine whether the right to a trial by jury is "fundamental" in the context of our juvenile courts, within the meaning of *Duncan.*

In seeking to answer this question, we must recognize that the due process procedural safeguards which *Gault* specifically made applicable to juvenile courts have already caused a significant "constitutional domestication" of juvenile court proceedings. The right

---

[10] 391 U.S. at 150, 88 S. Ct. at 1448 (footnote 14).

[11] Id.

[12] Id.

to adequate and timely notice, the right to counsel, the right of confrontation and cross-examination, and the privilege against self-incrimination serve to eliminate much of the danger of arbitrariness. Further, we are confident that juveniles also enjoy the right to have a transcript of the hearing, the right of appellate review,[13] and the right to be declared delinquent only upon evidence which demonstrates that the facts upon which the declaration is made are true beyond a reasonable doubt.[14] Together these rights insure that the juvenile court will operate in an atmosphere which is orderly enough to impress the juvenile with the gravity of the situation and the impartiality of the tribunal[15] and at the same time informal enough to permit the benefits of the juvenile system to operate.

---

[13] Act of June 2, 1933, P. L. 1433, 11 P.S. §257.

[14] ". . . The constitutional safeguard of proof beyond a reasonable doubt is as much required during the adjudicatory stage of a delinquency proceeding as are those constitutional safeguards applied in *Gault*—notice of charges, right to counsel, the rights of confrontation and examination, and the privilege against self-incrimination." *In re Winship*, No. 778, October Term, 1969 (Supreme Court of the United States, filed March 31, 1970).

[15] "[R]ecent studies . . . suggest that the appearance as well as the actuality of fairness, impartiality and orderliness—in short, the essentials of due process—may be a more impressive and more therapeutic attitude so far as the juvenile is concerned." 387 U.S. at 26, 87 S. Ct. at 1443.

"[T]here is another observation worth making. Informal methods relying on kindness, expertise, and discretion are most acceptable in contexts of trust. If nearly everyone in a community shares a common faith in institutions, and in the generally prevailing goals, safeguards designed to protect against abuse will not seem so important. . . . [But] this is not the situation in the crisis-ridden cities of today. . . . Divisions in the urban community are deep. Formal procedure, to some extent may be able to dispel mistrust. A judge who is supplied with specific rules regarding the fundamentals of fairness and who follows them may lessen the tensions that both he and the respondents feel. The adversary system that many see as a machine to sow discord does give the dispossessed a

The proper inquiry, then, is whether the right to a trial by jury is "fundamental" within the meaning of *Duncan,* in the context of a juvenile court which operates with *all* of the above constitutional safeguards. Since the Supreme Court felt that the right was "fundamental" in the context of the normal criminal process, which also operates with all of these safeguards, it is our view that the answer to our inquiry turns upon whether there are elements in the juvenile process which render the right to a trial by jury less essential to the protection of an accused's rights in the juvenile system than in the normal criminal process, and therefore not so "fundamental" as to be constitutionally required.

We believe that such factors do inhere in the juvenile system. First, we believe that the judges in the juvenile courts do take a different view of their role than that taken by their counterparts in the criminal courts.[16] We fully realize that this faith in the quality of the juvenile bench is not an entirely satisfactory substitute for due process, and we certainly do not rely heavily on this essentially subjective factor; but on the other hand we do not choose to ignore such considerations, and will not deprive them of all weight.

Second, the juvenile system has available and utilizes much more fully various diagnostic and rehabilitative services. And although the experts are not nearly so numerous as one might hope, they still provide the juvenile courts with services specially designed to aid minors, which are far superior to those available in

---

voice, and a time and place to be heard, and may offer a sense of participation in the decision-making that may affect respondents mightily. Ironically, the adversary system may provide some badly needed glue for the preservation of unity." Paulsen, *The Constitutional Domestication of the Juvenile Court,* 1967 Supreme Court Review 233, 242-43 (1967).

[16] See generally *Commonwealth v, Johnson,* 211 Pa. Superior Ct. 62, 234 A. 2d 9 (1967).

the regular criminal process. It is the opportunities for progress offered by this area which constitute the single best reason for preserving the juvenile system. Properly operated, the juvenile system is capable of giving understanding and sympathetic treatment for each juvenile by providing the correctional, rehabilitative and instructional attention appropriate to each case. Having recognized the value of this approach, it is indeed regrettable that it is as inadequately utilized as it is. In this area more than in any other, it is the false economies of today which will contribute exponentially to the waste of tomorrow. Yet a little bit of wisdom is better than none, and in the end we see this aspect of the juvenile system, underused though it may be, as constituting one of its very real strengths.

Third, we must recognize that the end result of a declaration of delinquency *is* significantly different from and less onerous than a finding of criminal guilt. There is no public record of the adjudication,[17] and its results are not admissible in subsequent legal proceedings. None of the disabilities which follow a criminal conviction attach to an adjudicated delinquent,[18] and most importantly, the institutions to which juveniles are committed are something less than jails, for there is a greater emphasis on rehabilitation. We do not mean to say that the post-adjudication process has lived up to expectations. It has in many respects fallen far short of its goals, and its reality is far harsher than its theory. But we are not yet convinced that the cur-

---

[17] "The records of the proceedings of the juvenile courts shall be kept in a docket separate from all other proceedings of such courts, and shall be withheld from indiscriminate public inspection, but shall be open to inspection by the parent or other representative of the person, institution, association or society concerned, and other persons having a legitimate interest." Act of June 2, 1933, P. L. 1433, 11 P.S. §245.

[18] Act of June 2, 1933, P. L. 1433, 11 P.S. §261.

rent practices do not contain the seeds from which a truly appropriate system can be brought forth.

Finally, we note that of all the possible due process rights which could be applied in the juvenile courts, the right to trial by jury is the one which would most likely be disruptive of the unique nature of the juvenile process. Utilization of the other due process rights in the juvenile courts will not require the judge to abandon traditional practices; the hearing can still be conducted with some flexibility and with patience and understanding. A jury trial, on the other hand, by replacing the judge as the finder of fact, would probably require substantial alteration of the traditional practices. Faced with the necessity of refereeing a contest between the state and one of its juvenile citizens, and deprived of the power of the final arbiter, the juvenile court judge would of necessity have to concern himself much more with the technicalities of proper procedure, and would have a vastly reduced capacity to guide and mold the hearings. It is our view that the procedural rights which we have held applicable in the juvenile process will give the juveniles sufficient protection, and there is no need to add an element, the right to a trial by jury, which might well destroy the traditional character of juvenile proceedings.

As must be obvious by this time, we are confident that a properly structured and fairly administered juvenile court system can serve our present societal needs without infringing on individual freedoms.[19] It is this

---

[19] This Court, under the power granted it by Article V, Section 10(c) of the Pennsylvania Constitution, has the authority to formulate rules governing the practice, procedure and conduct of the juvenile courts in this Commonwealth. This authority can and will be utilized whenever circumstances indicate that action is necessary to maintain the constitutionality and fairness of juvenile proceedings, and we note that a committee is currently formulating, for submission to this Court, a set of comprehensive rules covering juvenile proceedings.

confidence which, as much as anything else, has led us to the conclusion we reach today. Until such a time as we are disabused of our belief that the potential for growth inherent in the juvenile system will not be ignored, we hold that the juvenile courts in this Commonwealth, if conducted in accordance with the procedural safeguards set forth in this opinion, are not constitutionally compelled to grant their constituency the right to a trial by jury.

Orders affirmed.

DISSENTING OPINION BY MR. JUSTICE COHEN:

The Sixth Amendment to the United States Constitution states "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . ." In *Duncan v. Louisiana,* 391 U.S. 145, 154 (1968), the United States Supreme Court held that "the right to jury trial in serious criminal cases is a fundamental right and hence must be recognized by the States as part of their obligation to extend due process of law to all persons within their jurisdiction." The majority recognizes these principles but finds that four factors inhere in the juvenile system which "render the right to a trial by jury less essential to the protection of an accused's rights . . . than in the normal criminal process, and therefore not so 'fundamental' as to be constitutionally required." These elements are (1) the different view of their role taken by judges in the juvenile courts as opposed to their counterparts in the criminal courts, (2) the availability to and the utilization by the juvenile system of various diagnostic and rehabilitative services, (3) the different end result of a declaration of delinquency compared with a finding of criminal guilt, and (4) the disruption of the unique nature of the juve-

nile process that would result from the introduction of jury trials.

The majority apparently believes that the existence of these factors means that the due process of law is not denied juveniles when they are denied a jury trial and thus that the juvenile court system is an exception to the general rule enunciated in *Duncan*. First, I cannot agree with the majority that footnote 14 in *Duncan* or anything else in the opinion represents a restriction on the absolutism of its holding. In that footnote, 391 U.S. at 149-50, the Court stated that incorporation was proper whenever "given this kind of system a particular procedure is fundamental—whether, that is, a procedure is necessary to an Anglo-American regime of ordered liberty." The Court then stated that it could easily imagine a fair and equitable criminal system that used no juries and remarked that such a system "would make use of alternative guarantees and protections which would serve the purposes that the jury serves in the English and American systems." That statement in no sense narrows the holding in *Duncan;* if anything, it amplifies it by emphasizing the role the jury plays in the Anglo-American system of jurisprudence. *Duncan* clearly stands for the proposition that the due process of law requires that the states provide jury trials in all serious criminal cases.

Having determined that nothing in the *Duncan* opinion itself detracts from the absolutism of its holding, it is necessary to examine the four elements the majority believes distinguish the juvenile system from the criminal court system to see if they are legally and/or constitutionally relevant. The majority itself states that it does not rely heavily on the first factor (the view of their role taken by juvenile court judges), and the United States Supreme Court, in the recent case of *In re Winship,* 397 U.S. 358 (1970) (holding that the

constitutional standard of proof beyond a reasonable doubt is required during the adjudicatory stage of a delinquency proceeding), stated, 397 U.S. at 365-66, "[w]e made clear in that decision [Gault] that civil labels and good intentions do not themselves obviate the need for criminal due process safeguards in juvenile courts. . . ."

As to the availability to and utilization by the juvenile system of various diagnostic and rehabilitative services (factor 2), this seems relevant to the post-adjudicative or dispositional process rather than to the adjudicative stage. Certainly the process by which one is adjudged a delinquent has little to do with the understanding and sympathetic treatment the juvenile system is capable of giving through correctional, rehabilitative and instructional attention. What is done with an individual after it is determined he is a delinquent is a very different problem from that concerning the process by which it is decided that he is a delinquent.

The majority's third element is the different end result of a declaration of delinquency compared to a finding of criminal guilt. This includes no public record of the adjudication, the inadmissibility of the results in subsequent legal proceedings, the nonimposition of the disabilities which follow a criminal conviction, and the fact that institutions for juveniles are "something less than jails." In *Winship*, however, the United States Supreme Court stated, 397 U.S. at 365: "We do not find convincing the contrary arguments of the New York Court of Appeals. *Gault* rendered untenable much of the reasoning relied upon by that court to sustain the constitutionality of §744(b). The Court of Appeals indicated that a delinquency adjudication 'is not a "conviction" (§781); that it affects no right or privilege, including the right to hold public office or to obtain a license (§782); and a cloak of protective

confidentiality is thrown around all the proceedings (§§783-784).'" In light of this, I feel that the third element is constitutionally irrelevant.

The final element is the disruption of the unique nature of the juvenile process which would allegedly occur with the introduction of trial by jury. There seems little doubt that the introduction of jury trials would necessitate the judge's concerning himself with the technicalities of proper procedure to a greater extent than required now and would reduce somewhat the flexibility and informality of the hearing. It would seem, however, that the beneficial aspects of the juvenile system result not from the adjudicatory stage but rather from the pre- and post-adjudicative stages in which, hopefully, some rehabilitation can be accomplished. It is difficult to see how the informality or flexibility of the hearing can have much effect on molding the juvenile's outlook so that his conduct will be in conformity with the rules society has established. Informality and flexibility are not ends in themselves: the purpose of the adjudicatory stage is to determine whether the defendant is a delinquent, and as some loss of informality and flexibility will not have a great effect on whatever rehabilitation the juvenile system can accomplish, I do not see an alteration of the "traditional character of juvenile proceedings" as so weighty a factor as to render the right to a jury trial less fundamental in the juvenile system than in the ordinary criminal process.

Therefore, I do not feel that the elements on which the majority relies are of such relevance and validity as to distinguish the juvenile system from the criminal court system and thus make the broad holding of *Duncan* inapplicable.

Courts today appear to be of two minds with respect to the rights of juveniles. The United States

Supreme Court decisions in *Gault* and *Winship* make clear that the essentials of due process and fair treatment must be applied to the adjudicatory stage of delinquency proceedings, but in *Winship* the Court was careful to point out that its holding would not destroy the beneficial aspects of the juvenile process. Thus, due process and parens patriae have come into direct conflict. Such conflict can be seen in the decisions of this Court. For example, the majority opinion in *Wilson Appeal,* 438 Pa. 425, 264 A. 2d 614 (1970), emphasizes constitutional requirements while the tone of the majority opinion in this action reflects the feeling that juveniles and the juvenile court system are somehow different and special and that the beneficial aspects of the juvenile process will be destroyed by the application of too many of the rights given adults. The trend of the United States Supreme Court decisions, however, appears to be away from parens patriae in the adjudicatory stage, and the right to trial by jury is an essential part of the adjudicatory process. I do not see valid reasons why *Duncan* should not apply to the juvenile court system.

Finally, as the United States Supreme Court has granted certiorari in *In re Burrus,* 397 U.S. 1036 (1970), in which it will face the issue presently before us, we should not have filed the opinions in this action until the *Burrus* opinion is filed. We, of course, will be bound by its decision, and, as we have waited this long for this difficult issue to be resolved, we should wait until the matter is finally settled. Once the *Burrus* opinion is filed, our opinion in this action will be of no consequence, and it is a futile effort for us to deal with this issue at this time.

I dissent.