554 A.2d 542

COMMONWEALTH of Pennsylvania

v.

Eric MITCHELL, a Child, Appellant.

In the Interest of Aaron MITCHELL.

Appeal of Aaron MITCHELL.

Superior Court of Pennsylvania.

Submitted Aug. 29, 1988.

Filed Feb. 15, 1989.

Irene H. Cotton, Philadelphia, for appellant (at 1556).

John Packel, Assistant Public Defender, Philadelphia, for appellant (at 1794).

Donna Zucker, Assistant District Attorney, Philadelphia, for Com., appellee (at 1556).

Before OLSZEWSKI, KELLY and HESTER, JJ.

OLSZEWSKI, Judge:

This is a consolidated appeal from orders of commitment after appellants were adjudicated delinquent. Appellants, Aaron and Eric Mitchell, raise the following issues for our review: (1) whether there was sufficient evidence to support appellants' respective adjudications of resisting arrest under 18 P.C.S.A. § 5104; and (2) whether the University of Pennsylvania campus police acted within their jurisdiction in detaining or arresting appellants under 71 P.S. § 646. In addition, Aaron contends that the evidence was insufficient to support an adjudication of delinquency on the charge of recklessly endangering another person. For the reasons below, we affirm.

Appellants, respectively, were charged with delinquency by reason of robbery,[1] attempted theft,[2] aggravated assault,[3] simple assault,[4] conspiracy,[5] resisting arrest,[6] and recklessly endangering another person.[7] Thereafter, appellants filed motions to suppress identification and physical evidence which were denied after hearing. On May 11, 1988, an adjudicatory hearing was held during which witnesses on behalf of the Commonwealth testified, Eric testified and testimony taken at the motions' hearing was incorporated in the Commonwealth's case-in-chief. After the adjudicatory hearing, the trial court found appellants delinquent of resisting arrest, and also found Aaron delinquent of recklessly endangering another person. Subsequently, the trial court committed each appellant to a Youth Development Center for a period of two years. Appellants, thereafter, timely filed notices of appeal.[8] On March 31, 1988, this Court granted Aaron's petition to consolidate appeals for our review.

The following facts were established in the court below. On February 22, 1987, Mary Hendricks telephoned the University of Pennsylvania campus police, and reported that she had been followed by two black, male, teenaged twins, wearing identical brown jackets with fringe or fur at the seams, blue jeans and sneakers, as she was walking from a

1.  18 P.S.C.A. § 3701.

2.  18 P.S.C.A. § 901.

3.  18 P.S.C.A. § 2702.

4.  18 P.S.C.A. § 2701.

5.  18 P.S.C.A. § 903.

6.  18 P.S.C.A. § 5104.

7.  18 P.C.S.A. § 2705.

8.  After the trial court's finding of delinquency, Eric filed a motion in arrest of judgment. We note that Eric's motion was not required in the instant matter. Although Rule 1123 of the Pennsylvania Rules of Criminal Procedure provides that a defendant has the right to file a motion for a new trial and in arrest of judgment, this rule is not applicable to juvenile proceedings. *See* Pa.R.Crim.P. 1 ("[Pennsylvania Rules of Criminal Procedure] shall govern criminal proceedings in all courts including courts not of record. Unless otherwise specifically provided, these rules shall not apply to juvenile or domestic relations proceedings.")

supermarket located at 43rd and Locust Streets, Philadelphia. Approximately ten to fifteen minutes later, when she reached 40th and Spruce Streets, she observed a hand reaching from behind her and into her coat pocket from which her wallet was protruding.[9] She turned around and looked at appellants, who were standing immediately behind her. Within a matter of seconds, appellants proceeded west on Spruce Street. Once she believed that appellants were on their way, Ms. Hendricks continued south on 40th Street. Halfway down the block, however, she saw appellants directly behind her. She hurried to her residence, and contacted the University of Pennsylvania campus police. Appellants did not follow Ms. Hendricks to her residence.

On February 22, 1987, approximately 4:15 or 4:30 p.m., while on foot patrol in the 3900 block of Walnut Street, Philadelphia, Officer Gary Cooper of the University of Pennsylvania campus police received a radio call that a robbery had been attempted three to five minutes ago at 40th and Spruce Streets. The call contained a description of appellants. While receiving the radio message, and as he was walking on the south side of Walnut Street, Officer Cooper observed appellants walking east from 40th Street. Officer Cooper, thereafter, radioed for assistance. When Officer Talyai, a campus police officer, arrived, Officer Cooper pointed out appellants who were departing an arcade on the north side of Walnut Street. Officers Cooper and Talyai approached appellants, identified themselves and requested to speak with appellants "for a couple of minutes." (N.T. 4/7/87 at 7). Appellants cooperated, at which time appellants and the officers walked towards a donut shop located at the 3900 block of Walnut Street.[10] In front of the donut shop, Officers Cooper and Talyai informed appellants that they were being stopped because they fit the description of two suspects in an attempted theft. Officer Talyai further explained that the complainant was

9. The record is unclear whether the witness saw a hand reach into her coat pocket or come towards her coat pocket.

10. Officer Talyai testified that appellants were initially stopped in front of the donut shop. (N.T. 4/7/87 at 25).

on her way and that, if she identified them, action would be taken, and if not, they could leave. Eric, who was standing between Officer Cooper and the outside wall of the donut shop, responded by grabbing Officer Cooper's collar and pushing him away. The two struggled briefly before Eric broke free and ran east on Walnut Street. A pedestrian tackled Eric, knocking him down to the ground. Thereafter, Eric was subdued by Officer Cooper and other campus police officers who had arrived on the scene.

Aaron also attempted to leave by grabbing Officer Talyai's arm and trying to throw Officer Talyai to the ground. Aaron broke away and ran east on Walnut Street for approximately one hundred feet before another pedestrian blocked his path and knocked him to the ground. Arriving on the scene, campus police officer, Thomas Rambo, grabbed Aaron. Aaron swung at Officer Rambo, missing him, then placed his hand on the handle of Officer Rambo's revolver, unsnapping the holster. Officer Rambo grabbed Aaron's wrist to remove his hand from the revolver and was able to subdue and handcuff Aaron. Both appellants were handcuffed and transported to University of Pennsylvania campus police headquarters for identification by the complainant.

Appellants first maintain that there was insufficient evidence to support appellants' respective adjudications of resisting arrest pursuant to 18 P.S.C.A. § 5104. Specifically, appellants contend that the evidence is insufficient because the University of Pennsylvania campus police officers who approached appellants had informed them, immediately prior to the altercation, that they were not being placed under arrest.[11] We find appellants' contention meritless in light of the evidence presented in the court below. 18 P.S.C.A. § 5104 provides:

A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effect-

**11.** Eric does not frame the issue in terms of the sufficiency of the evidence. Eric argues that an individual has the right to resist when a police officer informs him that he is not being placed under arrest. We address appellants' contentions as one.

ing a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.

To be adjudicated delinquent under this section, it is essential that there be a lawful arrest. *See Commonwealth v. Karl,* 328 Pa.Super. 97, 476 A.2d 908 (1984) (conviction pursuant to 18 P.C.S.A. § 5104 requires lawful arrest). With respect to this first contention, appellants do not contest the lawfulness of the campus police action under this section. They, however, argue that no arrest occurred.

The test for the occurrence of an arrest has often been defined as the happening of any act that indicates an intention to take the individual into custody and subjects him to the actual control and will of the person making the arrest. *Commonwealth v. Farley,* 468 Pa. 487, 364 A.2d 299 (1976); *Commonwealth v. Allessie,* 267 Pa.Super. 334, 406 A.2d 1068 (1979). An arrest may thus be effectuated without the actual use of force and without a formal statement of arrest. *Commonwealth v. Daniels,* 455 Pa. 552, 317 A.2d 237 (1974). The question is viewed in light of the reasonable impression conveyed to the person subjected to the seizure rather than in terms of the subjective view of the police officer. *Commonwealth v. Holmes,* 482 Pa. 97, 393 A.2d 397 (1978); *Commonwealth v. Richards,* 458 Pa. 455, 327 A.2d 63 (1974). *Commonwealth v. Maddox,* 307 Pa.Super. 524, 528–29, 453 A.2d 1010, 1012 (1982), *quoting Commonwealth v. Benson,* 280 Pa.Super. 20, 27, 421 A.2d 383, 386–387 (1980).

■ Although Officer Cooper told appellants that they were not being placed under arrest, it is evident from the record that appellants believed they were not free to go. First, we find it significant that Eric replied, "You can't lock us up," (N.T. 4/6/87 at 8), after Officer Cooper identified himself and informed appellants that they fit the description of twins who were involved in an attempted rob-

bery. Second, we note that a physical struggle between Eric and Officer Cooper occurred after Eric was informed by Officer Cooper that he was being detained for identification. Finally, we find Eric's testimony further indicates that he believed he was under the actual control of the campus police. Eric testified that, after he was leaving the arcade and walking down the street, "two police walked up to him." (N.T. 5/11/87 at 35). He stated:

[The officers] told me to get up against the wall. I got up against the wall and then, they told me to put my hands up against the window, and I put my hands against the window, and then I turned 'round and saw one of them clonking me in the head with a night stick. I ask, "Why you hit me," and I kept asking, and I said, "What we being stopped for," and he would not tell us. I kept asking, "What we being stopped for," and he would not tell us.

Then, he said talk to your buddy. And then, they checked him and after that, they spin us 'round and told us to get on the ground. And then, we like, you know, said "For what," and my brother said, "We ain't getting on the ground 'cause we ain't do nothing," like that. And then, they tried to force us on the ground and hit my brother with a night stick in the head.

(N.T. 5/11/87 at 35). In reviewing the record, we also find that Aaron reasonably believed he was being placed under arrest. Officer Talyai testified that he attempted to detain Aaron; however, Aaron attempted to throw Officer Talyai to the ground. Moreover, we find it significant that Aaron struggled over Officer Rambo's gun. In light of the foregoing circumstances, it is apparent that Aaron, like Eric, was under the reasonable impression that he was subject to the control and custody of the campus police officers.

Second, appellants assert that the University of Pennsylvania campus police acted outside their jurisdiction in arresting appellants under 71 P.S. § 646. Aaron argues that 71 P.S. § 646 does not confer authority on campus police "to arrest [Aaron] on commercial property owned by the

University of Pennsylvania but used exclusively for investment purposes" nor does the statute confer authority on campus police to arrest Aaron "for an offense which the Commonwealth failed to prove was committed within the 'campus.' " Aaron's brief at 10.[12] 71 P.S. § 646 reads in pertinent part:

The Capital Police, Commonwealth Property Police and the Security or *Campus Police of all State colleges and universities, State aided or related colleges and universities and community colleges shall have the power, and their duty shall be:*

\* \* \* \* \* \*

(h) *To arrest any person who* shall damage, mutilate or destroy the trees, plants, shrubbery, turf, grass-plots, benches, buildings or structures, or *commit any other offense* within State Buildings *on* State grounds in Dauphin County, the Pittsburgh State Office Building and grounds, and the Philadelphia State Office Building and grounds, the executive Mansion, and *the grounds and buildings of all State colleges and universities, State aided or related colleges and universities and community colleges,* and carry the offender before the proper alderman, justice of the peace or magistrate and prefer charges against him under the laws of the Commonwealth.

Security and Campus Police shall exercise their powers and perform their duties only on the *premises* of the State colleges and universities, State aided or related colleges and universities and community colleges by or for which they are employed and only and after they have completed a course of training including crisis intervention training and riot control as approved by the Department of Education except, that Campus Police employed

---

**12.** Eric's argument is based upon a different theory. Eric maintains that 71 P.S. § 646 does not allow the campus police to arrest him on property that provides no indication to an individual that it is connected with the University of Pennsylvania. We summarily dismiss this argument as having no merit. Campus police territorial jurisdiction cannot be based on an individual's subjective impression.

by State owned colleges and universities located in any municipalities, other than cities of the first class or second class, are authorized, in emergency situations occurring within the municipality, upon the request of the mayor or other executive authority and under the direction of the local law enforcement authorities, to exercise those powers and perform those duties conferred pursuant to this section within the municipality for the limited purpose of aiding local authorities in emergency situations. When so acting, the Campus Police shall be acting within the scope of the authority of this act and are, at all times, State employes of this Commonwealth and entitled to all the rights and benefits accruing therefrom.

71 P.S. § 646(h) (emphasis added).

In construing legislation, we must "ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S.A. § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b). Where, however, the words of the statute are ambiguous and unclear, we may ascertain the intention of the General Assembly by considering, among other matters,

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S.A. § 1921(c).

In addition, we recognize that 71 P.S. § 646 is not a penal statute and, therefore, "must be liberally construed to effect its object and to promote justice." *Commonwealth v. Holderman*, 284 Pa.Super. 161, 167, 425 A.2d 752, 755

(1981); 1 Pa.C.S.A. § 1928. We also may presume that the Legislature did not intend "a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S.A. § 1922.

■ Aaron contends that "[t]he clear intention of the legislature was to limit police powers of campus security guards to the 'campus,' *i.e.*, the educational and residential grounds of a school." Aaron's brief at 10. We disagree. First, in reviewing the language of the statute, we note that the legislature did not make any distinction between commercial property used for investment purposes as opposed to property used for academic or residential purposes. If the legislature clearly intended such a distinction, it could have easily excluded campus commercial property used for investment purposes from campus police jurisdiction. It did not do so. Consequently, we turn to the legislative history of the statute to determine what constitutes "grounds and buildings" and "premises" within the statutory framework of 71 P.S. § 646(h). In considering proposed amendments to extend provisions of the statute to state-aided colleges and universities, the legislature specifically refers to the need to alleviate the burden upon the "Philadelphia Police Force" in "dealing with crime which occurs in the area around the University of Pennsylvania." *Legislative Journal*—Senate at 333 (June 3, 1968). In addition, the legislature acknowledges the delay that results from colleges and universities depending on local police or state police authorities for police protection. *See Legislative Journal*—Senate at 333 (June 3, 1968).

In light of the foregoing legislative history, we find that a distinction between commercial property used for investment purposes and property maintained for academic or residential purposes is contrary to the legislature's objectives in providing effective campus police protection. A college or university is not limited to academic and residential areas. In addition to the library, classrooms and labs, there are commercial establishments, *i.e.*, bookstores, banks and food services owned or operated by a college or university. These commercial establishments, in many in-

stances, serve as investments for the college or university and are frequented by the student body. Moreover, the grounds or premises of a college or university, especially when located within a municipality, may not be contiguous, but may be located in or constitute various sections of the municipality. Thus, if we were to agree with Aaron's interpretation, we would be ignoring the layout and everyday operation of a college or university. We find the legislature would not have created a situation where it would have ignored the realities of the college or university campus and make campus police territorial jurisdiction contingent upon whether an offense or arrest takes place in a library as opposed to a college or university bookstore. Such a distinction would create jurisdictional chaos and be contrary to the legislature's specific interest in preventing delay of police services to the colleges and universities. In addition, we are cognizant of the legislature's goal in alleviating the burden on municipal police officers in supplying services. This goal cannot be achieved to its fullest extent if commercial establishments of a college or university are excluded from campus police territorial jurisdiction. We, therefore, conclude that "premises" and "grounds and buildings" within the statutory framework of 71 P.S. § 646(h) include, not only academic and residential areas, but also commercial property of a college or university used for investment purposes.

In the instant case, Lieutenant Steven E. Heath of the University of Pennsylvania campus police testified that the boundaries of the campus property are the Schuylkill Expressway to the east, 43rd Street to the west, Woodland Avenue to the south and Market Street to the north. He further testified that the boundaries delineated *supra* are "the geographical boundaries of the property that is owned by the university that is used socially by the university for either academic or recreational purposes or other types of business conducted by the university." (N.T. 4/27/87 at 20). The record also indicates that properties on the north side of the 3900 block of Walnut Street are owned by a

subsidiary of the trustees of the University of Pennsylvania for university investment purposes. We find the trial court did not abuse its discretion in finding that the arrest occurred on the "premises" of the University of Pennsylvania. We further find that the alleged offense took place on the "grounds" of the University of Pennsylvania. The record establishes that the alleged offense occurred on the southeast corner of 40th and Spruce Streets, within the boundaries of the properties owned by the University of Pennsylvania.[13]

Finally, Aaron maintains that the evidence is insufficient to support his adjudication of recklessly endangering another person. Specifically, Aaron contends that the Commonwealth has failed to prove that he possessed the actual present ability to inflict death or seriously bodily injury.

In reviewing the sufficiency of the evidence to support the adjudication below, we recognize that the Due Process Clause of the United States Constitution requires proof "beyond a reasonable doubt" at the adjudication stage when a juvenile is charged with an act which would constitute a crime if committed by an adult. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Terry Appeal*, 438 Pa. 339, 347, 265 A.2d 350, 354 (1970), aff'd, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). Additionally, we recognize that in reviewing the sufficiency of the evidence to support the adjudication of delinquency, just as in reviewing the sufficiency of the evidence to sustain a conviction, though we review the entire record, we must view the evidence in the light most favorable to the Commonwealth. *See, e.g., Commonwealth v. Lawrence*, 428 Pa. 188, 236 A.2d 768, 769 (1968).

13. We take judicial notice that the southeast corner of 40th and Spruce Streets is located within the geographical boundaries delineated by Lieutenant Heath. *Goff v. Armbrecht Motor Truck Sales, Inc.*, 284 Pa.Super. 544, 548 n. 4, 426 A.2d 628, 630 n. 4 (1980) ("An appellate court may take judicial notice of a fact to the same extent as a trial court"). *See also Commonwealth v. McCaskill*, 321 Pa.Super. 266, 273 n. 3, 468 A.2d 472, 475 n. 3 (Superior Court can take judicial notice of fact that July 22, 1971 was a Thursday).

*In re Johnson,* 445 Pa. 270, 272–73, 284 A.2d 780, 781 (1971).

18 P.S.C. § 2705 provides:

A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.

■ In *Commonwealth v. Trowbridge,* 261 Pa.Super. 109, 395 A.2d 1337 (1978), this Court construed 18 P.S.C. § 2705 to require proof of actual present ability to inflict death or serious bodily injury to support a conviction under the statute. "[M]ere apparent ability to inflict harm is not sufficient. Danger, and not merely the apprehension of danger, must be created." *Id.,* 261 Pa.Superior Ct. at 115, 395 A.2d at 1340. Aaron contends that, because he did not succeed in removing Officer Rambo's gun from his holster and pointing it at the officer, he did not possess the actual present ability to inflict harm. We disagree. Instantly, there is sufficient evidence to support a finding that Aaron created a situation where the risk of death or serious bodily injury to Officer Rambo was real. Officer Rambo testified that Aaron was swinging wildly and attempting to throw him to the ground. During the struggle, Aaron grabbed Officer Rambo's revolver and unsnapped the holster so that it could easily be removed. Given these circumstances, we find that it was not necessary that appellant actually point a gun to be adjudicated delinquent by reason of recklessly endangering another person. Aaron possessed the actual present ability to inflict harm by struggling over an officer's gun. There was the very strong possibility that the revolver could discharge, injuring Officer Rambo.[14] Thus,

---

**14.** It was also reasonably foreseeable that pedestrians would be placed in danger of harm given that two pedestrians had already interceded in the officers' attempts to detain appellants. Aaron, however, was not charged with recklessly endangering pedestrians. *See Commonwealth v. Baker,* 287 Pa.Super. 39, 43 n. 1, 429 A.2d 709, 711 n. 1 (1981) ("[A] person put in danger of actual harm must be one of the individuals whom the accused is charged with endangering.").

we conclude that there is sufficient evidence to adjudicate Aaron delinquent of recklessly endangering another person.

Accordingly, orders of commitment are affirmed.

KELLY, J., files concurring opinion.

KELLY, Judge, concurring:

I concur in the result. I agree with appellant that at the time of his violent attempt to escape from the control of the campus police, he had been subjected only to a non-custodial detention and not a custodial detention or formal arrest. *See Commonwealth v. Ellis*, 379 Pa.Super. 337, 349–360, 549 A.2d 1323, 1329–34 (1988). Nonetheless, I would construe "arrest" as used in the resisting arrest statute to include lawful non-custodial detentions as well as custodial detentions and formal arrests.

I find that the statute is plainly intended to sanction and deter unlawful violent or potentially dangerous resistance by a suspect to the lawful exercise of police authority over the suspect. Though non-custodial detentions do not constitute "arrests" for Fourth Amendment purposes, they nonetheless involve the lawful exercise of control over a suspect while suspicious circumstances are being promptly investigated to determine whether formal arrest or release is appropriate. Any construction of 18 Pa.C.S.A. § 5104 which would distinguish between lawful non-custodial detentions and custodial detentions or formal arrests in this context would ignore the plain intent of the statute, unreasonably imperil law enforcement personnel, and carry constitutional distinctions improperly and illogically out of the context in which they belong. Though the statute could certainly be drafted so as to make this point more clearly, I decline to adopt any distinction such as that appellant has proposed absent a clear mandate by our legislature. *See* 1 Pa.C.S.A. §§ 1901, 1921(a); 1922(1).

I agree that the campus police had territorial jurisdiction to make this arrest. There is no basis in the language of the applicable statute to limit territorial jurisdiction of cam-

pus police based upon the use to which particular campus property is put. I note, however, that I do not read the majority opinion to have addressed or decided the issue of whether non-university property logically contained *within* a university campus (*e.g.* property surrounded by or contiguous on three sides to campus property) or property owned by a university but entirely removed from the main campus would fall within the jurisdiction of the campus police.