Commonwealth *v.* Johnson, Appellant.

Argued June 12, 1967. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*John H. Lewis, Jr.,* with him *Gregory M. Harvey,* for appellant.

*Alan J. Davis,* Assistant District Attorney, with him *Edwin D. Wolf,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY HOFFMAN, J., September 15, 1967:

On June 9, 1966, appellant, Norman Johnson, appeared before the Juvenile Division of the County Court of Philadelphia, on charges of rape, assault with intent to ravish, assault and battery and indecent assault. The facts in this case necessary for an understanding of our decision today are set forth more fully in the following discussion.

### Self-Incrimination

Appellant first argues that he was denied his constitutional privileges against self-incrimination. The lower court, in an excellent opinion, correctly stated the law and the uniform practice in juvenile courts of our Commonwealth at that time: "No juvenile in a proceeding before the juvenile court can refuse to testify. To permit this practice would simply nullify the intent and effect of the Juvenile Court Act. The privilege against self-incrimination provided by Article I, sec. 9 of the Pennsylvania Constitution does not apply to the questioning of a juvenile in a delinquency proceeding: Holmes' Appeal [379 Pa. 599, 109 A. 2d 523

(1954), cert. denied, 348 U.S. 973 (1955)]. We granted the accused this privilege after first refusing it, mainly because of the persuasive efforts of counsel and our respect for his position as advocate. However, the law in this Commonwealth on the point is clear and no error results from our having ordered the juvenile accused to testify or considered his testimony in framing the adjudication."[1]

The above paragraph, however, no longer represents the constitutional standard of due process which must be afforded to juveniles, by reason of the holding in *In re Gault*, 387 U.S. 1, 55 (1967), that ". . . the constitutional privilege against self-incrimination is applicable in the case of juveniles *as it is with respect to adults.*"

We conclude, therefore, that the court's acknowledged order that the juvenile testify constituted a denial of due process which requires the vacating of the lower court's order and a new hearing.

Ordinarily, such a determination would obviate our passing on further issues raised on appeal. Since one

---

[1] The Commonwealth suggests in its brief that the lower court did not compel defendant to testify and that defendant's testimony was voluntary. This argument is apparently refuted by the judge's own statement, quoted above, that he did order such testimony at one point in the hearing and took such testimony into consideration. It is not for us to speculate as to whether counsel for appellant felt compelled to put his client on the stand after the court stated: "If you don't want to put him on, that is entirely up to you. But he is a juvenile, you are his attorney, if you want to put him on go ahead. That is entirely up to you. I am not going to let any juvenile take any fifth amendment and then we will be setting a precedent." (N.T. 42). While the judge's intent in this statement is not entirely clear, it would appear to us to contain the veiled suggestion that even if counsel would not put defendant on the stand as part of his own case, the court might, nonetheless, question the juvenile on its own. Moreover, since this was the practice in our juvenile courts at that time, such an inference would not be unwarranted.

of these issues is inextricably bound to the new hearing which will be held, however, it is incumbent upon us to consider it at this time.

## Jury Trial

The argument most strongly urged upon us by appellant in this case is that he was denied the right of trial by jury in violation of the Constitutions of the United States and of the Commonwealth of Pennsylvania.

Section 5 of the Juvenile Court Law, Act of June 2, 1933, P. L. 1433, §5, 11 P.S. §247 provides: "Except as hereinafter provided, the court shall hear and determine all cases affecting children arising under the provisions of this act without a jury." Appellant argues that this particular provision is in violation of Article I, §6 of the Constitution of Pennsylvania which provides, "Trial by jury shall be as heretofore, and the right thereof remain inviolate," since, under Article I, §9 of the Constitution, an individual accused of rape was always entitled to a trial by an impartial jury.

It is of course true, as appellant suggests, that under these provisions, an ". . . individual is entitled to a public trial by an impartial jury of the vicinage in every situation in which he would have been entitled to such a trial at the time of the adoption of our State Constitution of 1790. . . ." *William Goldman Theatres v. Dana,* 405 Pa. 83, 93, 173 A. 2d 59 (1961). We similarly agree that the change of the name of the offense from "rape" to "delinquency" would not, of itself, affect the constitutional right of the accused to a trial by jury. See *Mountain v. Commonwealth,* 68 Pa. Superior Ct. 100, 103 (1917). However, we reject appellant's conclusion that he would have been entitled to trial by jury prior to 1790 in this case.

Appellant cites *Mansfield's Case,* 22 Pa. Superior Ct. 224 (1903), in which our Court was called upon to determine the constitutionality of the Act of May 21, 1901, P. L. 279, the first Juvenile Court Law in our Commonwealth. In *Mansfield,* the appellant was charged with larceny, but the formal charge was converted into a general charge of delinquency. Our Court decided that appellant would have had a right to jury trial upon the charge of common law larceny, and held, therefore, that the Act of May 21, 1901, which purported to deny the juvenile defendant that right, was in violation of Article I, §6 and Article I, §9 of the Constitution of this Commonwealth.

This holding, however, was impliedly overruled, by the Supreme Court of Pennsylvania in *Commonwealth v. Fisher,* 213 Pa. 48, 62 A. 198 (1905). In that case the Supreme Court was faced with a juvenile, charged with larceny, who was to be tried under the Act of April 23, 1903, P. L. 274, the predecessor to our present Juvenile Court Law. The Court in *Fisher* held that the juvenile's right to trial by jury did not exist prior to 1790 in these circumstances. The Court stated: "Such a [juvenile] proceeding is not a trial for an offense requiring a . . . jury. It was never so regarded in England, nor has it been in this country in but few instances, notably cases in New Hampshire, and in People ex rel. O'Connel v. Turner, 55 Ill. 280. That case was in effect overruled by later cases and is not now considered as authority: Petition of Ferrier, 103 Ill. 367; McLean County v. Humphreys, 104 Ill. 378. As said, in substance, in the Ferrier case, the proceeding is not one according to the course of the common law in which the right of trial by jury is guaranteed, but a mere statutory proceeding for the accomplishment of the protection of the helpless, which object was accomplished before the constitution without the enjoyment of a jury trial." p. 56. This holding has been

repeatedly reaffirmed and cited by both appellate Courts of this Commonwealth, see, e.g., *Holmes' Appeal,* supra, *Mont Appeal,* 175 Pa. Superior Ct. 150, 103 A. 2d 460 (1954), *Commonwealth v. Carnes,* 82 Pa. Superior Ct. 335 (1923), *Commonwealth v. Henig,* 200 Pa. Superior Ct. 614, 189 A. 2d 894 (1963), and it is not for us, at this point, to re-examine its historical basis.

We similarly find no justification for appellant's contention that the denial of jury trial to this appellant is violative of his rights under the Sixth and Fourteenth Amendments to the Constitution of the United States. The Supreme Court of the United States has never held that the right to trial by jury under the Federal Constitution is imposed upon the States by the Fourteenth Amendment. The clearest statement in this regard was that of Justice CARDOZO in *Palko v. Conn.,* 302 U.S. 319, 324-25 (1937) : "The Sixth Amendment calls for a jury trial in criminal cases and the Seventh for a jury trial in civil cases at common law where the value in controversy shall exceed twenty dollars. This court has ruled that consistently with those amendments trial by jury may be modified by a state or abolished altogether. Walker v. Sauvinet, 92 U.S. 90; Maxwell v. Dow, 176 U.S. 581; New York Central R. Co. v. White, 243 U.S. 188, 208; Wagner Electric Mfg. Co. v. Lyndon, 262 U.S. 226, 232. . . . The right to trial by jury and the immunity from prosecution except as the result of an indictment may have value and importance. Even so, they are not of the very essence of a scheme of ordered liberty. To abolish them is not to violate a 'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental' . . ." See also *U.S. ex rel. Tillery v. Cavell,* 294 F. 2d 12 (3d Cir. 1961).

Appellant apparently recognizes the Supreme Court's reluctance to hold that the right to a jury trial

is obligatory in state criminal trials. He states, however, that the denial of trial by jury in juvenile proceedings results in the erosion of the rights granted by the United States Supreme Court in *Jackson v. Denno,* 378 U.S. 368 (1964). In *Jackson* the Court held that a state must provide the defendant with an opportunity to have an initial determination of the voluntariness of his confession prior to the submission of that issue to the trier of facts. Since in a juvenile proceeding a defendant does not have the right to trial by jury, appellant is forced to present the issue of the voluntariness of his incriminating statement to the trial court, which is also the trier of fact, thus emasculating the right guaranteed in *Jackson.* See also Comment, Criminal Offenders in the Juvenile Court, 114 U. Pa. L. Rev. 1171, 1188 (1966).

This argument, while superficially convincing, is without substance. It is based on the mistaken supposition that jury trials are necessary, in part, to implement the constitutional safeguards in *Jackson.* In fact, the reverse is true. The constitutional safeguards in *Jackson* were designed to assure fairness in jury trials. Appellant's contention, in other words, is not based on the right to trial by jury, but on the right to have an independent determination of voluntariness by someone other than the ultimate trier of fact, regardless of whether jury trial is elected or waived. This argument, therefore, has no direct bearing on appellant's claim of a constitutional right to jury trial, and need not be considered further by us at this time.

If our opinion to this point has conveyed the impression that appellant's arguments are of little weight or importance this impression should be corrected. The issue now raised is one of great complexity and significance, for it represents a deeper probing into the respective and comparative rights of adults and juveniles. Appellant's present demand for jury trial must be

viewed as part of the larger controversy which is presently raging in the courts and in academic circles as a result of the decision by the Supreme Court of the United States in *In Re Gault,* supra. We would be remiss in our duty if we did not consider appellant's argument within this larger framework.

A brief review of the history and conditions which resulted in the *Gault* decision are necessary for a full understanding of its implications.

The establishment of juvenile court systems throughout the United States was viewed by many as the greatest victory for legal reform movements in the twentieth century.

The first juvenile court act was adopted in Illinois in 1899. Pennsylvania followed shortly thereafter with the Act of May 21, 1901, P. L. 279, which was soon replaced by the Act of April 23, 1903, P. L. 274. Ultimately, juvenile court acts were adopted throughout the United States.

The juvenile court represented a new approach in society's attempts to deal with the juvenile offender. The delinquent was no longer viewed simply as a young criminal. He was regarded rather, as a wayward youth, who, because of his age, might be more easily rehabilitated than could the adult criminal. "Invoking the doctrine of parens patriae, the state sought to rehabilitate rather than punish the youthful offender. Thus, the structure of the juvenile court was pragmatically oriented toward securing the child's 'best interest.' Procedural formalities which prevailed in the criminal courts—where the state's position was basically antithetical to the interests of the suspected criminal—were thought inappropriate in the new institution, which was intended to cure, rather than to restrain and deter. Indeed, the juvenile court's procedures were fashioned so as to accord the judge the greatest possible opportunity to exercise a quasi-parental in-

fluence over the impressionable child." Note: Rights and Rehabilitation in the Juvenile Courts, 67 Columbia L. Rev. 281 (1967). Thus juveniles were denied the right to counsel, the right of confrontation and cross-examination, and the right to be free from self-incrimination. In addition, most states did not provide jury trials for juveniles. See *Pee v. U. S.,* 274 F. 2d 556 (D.C. Cir. 1959), 67 A.L.R. 1082, 100 A.L.R. 2d 1241. All of this was justified on the theory that the juvenile was merely being taken into custody; that he had not really been deprived of his liberty when he was imprisoned by a juvenile court.

The following statement by the Pennsylvania Supreme Court in *Holmes' Appeal,* supra, has been echoed in a multitude of opinions throughout the country: "The proceedings in such a court are not in the nature of a criminal trial but constitute merely a civil inquiry or action looking to the treatment, reformation and rehabilitation of the minor child. Their purpose is not penal but protective, aimed to check juvenile delinquency and to throw around a child, just starting perhaps on an evil course and deprived of proper parental care, the strong arm of the State acting as parens patriae." (p. 603).

With the passage of years, however, the grand hopes for the juvenile court system were never realized. Juvenile Court judges were not well-trained. Institutions were woefully inadequate. Psychiatric, psychological, probationary and sociological services were meager. Concurrently, juvenile delinquency, which had originally been viewed as a minor problem for society, emerged as a major concern. Particularly in the large urban centers, juveniles committed almost fifty percent of the serious crimes.[2] The recidivist rate among

---

[2] "Arrest of persons under 18 for serious crimes increased 47 percent in 1965 over 1960; the increase in that age group popula-

juveniles rose to staggering heights. As the numbers of juvenile crimes increased, hard-pressed juvenile courts found themselves unable to provide hearings which adequately protected the welfare of the children. The individualized attention and treatment originally envisioned as an integral part of the juvenile court system remained an unfulfilled dream. In this regard the Supreme Court in *Gault* quoted the following statement by Judge LEHMAN in A Juvenile's Right to Counsel in a Delinquency Hearing, 17 Juvenile Court Judges Journal 53, 54, 1966: "Unfortunately, loose procedures, high-handed methods and crowded court calendars, either singly or in combination, all too often, have resulted in depriving some juveniles of fundamental rights that have resulted in a denial of due process."[3]

It was against this background that the Supreme Court of the United States acted in *Gault*.

Gerald Gault was a 15 year old boy who had been committed to the State Industrial School by the Juvenile Court of Gila County, Arizona. A writ was filed on his behalf which attacked the constitutionality of the Arizona Juvenile Code, because it allegedly denied procedural due process to juveniles charged with

---

tion for the same period was 17 percent. In 1965, persons under 18 referred to juvenile court constituted 24 percent of all persons charged with forcible rape, 34 percent of all persons charged with robbery, 52 percent of all persons charged with burglary, 45 percent of all persons charged with larceny, 61 percent of all persons charged with auto theft." Report of the President's Commission on Law Enforcement and Administration of Justice, Juvenile Delinquency and Youth Crime (1967) (hereinafter cited as National Crime Commission Report.) p. 1.

[3] The Court also quoted the famous statement by the late Dean Roscoe Pound that, "The powers of the Star Chamber were a trifle in comparison with those of our juvenile courts. . . ." Foreword to Young, Social Treatment in Probation and Delinquency (1937) p. xxvii.

being delinquent. The Supreme Court of Arizona affirmed the dismissal of the writ. The United States Supreme Court, in reversing the Arizona Supreme Court, held that the hearing at a juvenile court adjudication of delinquency must measure up to the essentials of due process and fair treatment implicit in the Fourteenth Amendment.

Reaction to the *Gault* decision was immediate. Widely varying interpretations were read into the Court's decision. Some thought that the Court had directed that there be no distinctions between adults and juveniles. Others claimed that the juvenile court laws had been emasculated, if not fully destroyed.

Careful analysis of the *Gault* opinion, however, discloses no basis for such dire predictions or sweeping statements. We find in *Gault* an opinion carefully limited in scope. The Court held, in essence, that the hearing at which the juvenile is adjudged delinquent must comport with the essential requirements of procedural due process imposed upon the states by the Fourteenth Amendment to the Constitution. Specifically, the Court held that the juvenile must receive notice of the charges, right to counsel, right of confrontation and cross-examination, and the protection against self-incrimination. The ultimate basis for this decision was that the "failure to observe fundamental requirements of due process has resulted in instances which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact and unfortunate prescriptions of remedy. . . . It is these instruments of due process which enhance the possibility that truth will emerge from the confrontation of opposing versions and conflicting data." (pp. 19-21)

At no point in its opinion, however, does the Court suggest that its conclusion extends to every aspect of a juvenile court proceedings. Indeed, it takes great pains to emphasize that, "We do not in this opinion

consider the impact of these constitutional provisions upon the totality of the relationship of the juvenile and the state. We do not even consider the entire process relating to juvenile 'delinquents.' For example, we are not here concerned with the procedures or constitutional rights applicable to the pre-judicial stages of the juvenile process, nor do we direct our attention to the post-adjudicative or dispositional process. . . . We consider only the problems presented to us by this case. These relate to the proceedings by which a determination is made as to whether a juvenile is a 'delinquent' as a result of alleged misconduct on his part, with the consequence that he may be committed to a state institution."[4] (p. 13) (Emphasis added)

The Court further hastens to point out that no inference should be drawn from its opinion that juveniles must be treated exactly as are adults in criminal proceedings. Quoting from its earlier opinion in *Kent v. United States,* 383 U.S. 541, 562 (1966), it stated: " 'We do not mean . . . to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment.' We reiterate this view, here in connection with a juvenile court adjudication of 'delinquency,' as a requirement which is part of the Due Process Clause of the Fourteenth Amendment of our Constitution." (pp. 30-31).

Significantly, the Supreme Court in *Kent,* in making the above statement, was apparently relying on the following statement in *Pee v. U. S.,* supra, p. 559: "The constitutional safeguards vouchsafed a juvenile in such proceedings are determined from the requirements of

---

[4] Certainly implicit in *Gault,* is that procedural safeguards alone are no panacea. The institution of these safeguards in court proceedings will not arrest juvenile delinquency unless its root causes are also attacked.

due process and fair treatment, and not by the direct application of the clauses of the Constitution which in terms apply to criminal cases. So far as we can ascertain, with few exceptions in a multitude of cases, this has been the ruling of the courts. By the same token the Federal Rules of Criminal Procedure do not apply to these proceedings."

Nor does the Supreme Court suggest that the adversary system is now required in juvenile court, but only that Due Process requirements ". . . in contested cases will introduce *some* elements of the adversary system." (Emphasis ours) (p. 27) Finally the Court does not hold that a juvenile court may not act in a parental manner, but only that this authority must be curbed: "In Kent v. United States, supra, we stated that the Juvenile Court Judge's exercise of the power of the State as *parens patriae was not unlimited.* We said that 'The admonition to function in a "parental" relationship is not an invitation to procedural arbitrariness.' " (Emphasis added) (p. 30)

In short, those who find in *Gault* the obliteration of any distinctions between the treatment accorded juveniles and adults are reaching a conclusion that is unwarranted. It is clear to us that the Supreme Court has properly attempted to strike a judicious balance by injecting procedural orderliness into the juvenile court system. It is seeking to reverse the trend whereby "the child receives the worst of both worlds: . . . he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children." (*Kent v. U. S.,* supra, p. 556). It has not suggested that we discard the flexibility which has long been the hallmark of juvenile courts, but that we temper it with certain procedural safeguards.

The Supreme Court's opinion should not be viewed by the Courts or Judges of this Commonwealth as a mandate to abandon the juvenile court adjudicative

procedure. Rather, it is an invitation to formulate a court procedure which will combine the best aspects of juvenile and criminal court procedure into an amalgam which will offer the juvenile the best of both worlds. The Supreme Court, in our view, recognized that there are essential differences between the trial of adults and juveniles. Similarly, juvenile court judges must recognize these differences and exercise their discretionary powers, if the aims or purposes of the juvenile court are to be achieved.[5]

Every stage of the proceedings in juvenile court must be subject to the supervision and direction of the juvenile court judge. From the moment of intake, when the child is first screened by trained court personnel, until the final decision in court, the judge must be in command, ever ready to guide counsel, parent and child. Thus, any decision at intake as to whether the child should be discharged, referred to a community agency or held for court must be approved by the judge. He must decide whether the child should be detained pending neuropsychiatric and psychological examinations and whether an investigation into the suitability of the child's home life is appropriate.

During the actual court hearing, the juvenile court judge, after weighing the serious nature of the crime, the age of the child and the possibility of incarceration, must exercise his broad discretionary powers which allow him to employ techniques designed to

---

[5] The purposes of the juvenile court act was enunciated in the Standard Juvenile Court Act (National Probation and Parole Association (1959) §1:

"This Act shall be liberally construed to the end that each child coming within the jurisdiction of the court shall receive, preferably in his own home, the care, guidance, and control that will conduce to his welfare and the best interests of the state, and that when he is removed from the control of his parents the court shall secure for him care as nearly as possible equivalent to that which they should have given him."

serve the best interests of the child. He need not apply the same procedure for the incorrigible and the rapist, for the ten year old charged with larceny of a bicycle and the seventeen year old charged with armed robbery. He must be prepared to order further studies or testimony, in satisfying himself that he has sufficiently delved into all aspects of the case.

In certain circumstances it may become advisable to relax formal court procedure and to conduct an informal hearing. For example, if the judge recognizes that the child's difficulties stem from his home environment, it may be wise for the judge to withdraw from the courtroom to his chambers, accompanied only by defendant and counsel, and there try to uncover the truth in the absence of parents who might inhibit the child. The Supreme Court itself recognized in *Gault* that, "Of course, it is not suggested that juvenile court judges should fail appropriately to take account, in their demeanor and conduct, of the emotional and psychological attitude of the juveniles with whom they are confronted. While due process requirements will, in some instances, introduce a degree of order and regularity to juvenile court proceedings to determine delinquency, and in contested cases will introduce some elements of the adversary system, nothing will require that the conception of the kindly juvenile judge be replaced by its opposite. . . ." (pp. 26-27).

In essence, a judge of the juvenile court must be more than a trier of fact. He must seek to instill in the child a sense of value, impart a feeling of security and belonging, communicate the importance and dignity of being a member of society and, hopefully, in this manner, prevent the child from pursuing a criminal and antisocial career. A juvenile court judge must, in a unique manner, establish a relationship that will permanently alter the behavior patterns of the child. He must have patience, understanding, and a

genuine interest in the welfare of the child and must direct all of his efforts toward rehabilitation.

With this understanding of the decision in *Gault*, and of the proper functioning of the juvenile court, we turn again to appellant's request for jury trial.

As we have already noted, the right to a jury trial has never been held by the Supreme Court as an essential element of due process in State proceedings, nor does its absence deny the juvenile the opportunity to ferret out the truth. If jury trials are inserted into juvenile court proceedings, however, the juvenile court judge will be sorely limited in carrying out the special tasks which the legislature has assigned to him. The juvenile court judge, while maintaining order, must, nonetheless, be free to utilize those procedures which we have mentioned. He must be free to relieve the hearing of its austerity. He must be active in seeking the cooperation of child, parents and counsel in discovering the truth. He must be prepared to inject or vary his personality as the situation requires.

The National Crime Commission Report, supra, to which the Supreme Court frequently referred to *Gault*, contains the following significant statement: "Most States do not provide jury trial for juveniles. Even Illinois, New York, and California, which have recently revised their juvenile court laws to increase procedural safeguards for the child, have not extended the right to trial by jury. There is much to support the implicit judgment by these States that trial by jury is not crucial to a system of juvenile justice. *As this report has suggested, the standard should be what elements of procedural protection are essential for achieving justice for the child without unduly impairing the juvenile court's distinctive values.*" (Emphasis added).

"As has been observed, 'A jury trial would inevitably bring a good deal more formality to the juvenile

court without giving the youngster a demonstrably better fact-finding process than trial before a judge.' " (p. 38)

. In summary, we are in full agreement with the holding of the Supreme Court that the constitutional safeguards of the Fourteenth Amendment guaranteed to adults must similarly be accorded juveniles. It is inconceivable to us, however, that our highest Court attempted, through *Gault*, to undermine the basic philosophy, idealism and purposes of the juvenile court. We believe that the Supreme Court did not lose sight of· the humane and beneficial elements of the juvenile court system; it did not ignore the need for each judge to determine the action appropriate in each individual case; it did not intend to convert the juvenile court into a criminal court for young people. Rather, we find that the Supreme Court recognized that juvenile courts, while acting within the constitutional guarantees of due process, must, nonetheless, retain their flexible procedures and techniques. The institution of jury trial in juvenile. court, while not materially contributing to the fact-finding function of the court, would seriously limit the court's ability to function in this unique manner, and would result in a sterile procedure which could not vary to meet the needs of delinquent children. Accordingly, we reject appellant's request for a jury trial.

Order vacated and record remanded for a new hearing.

MONTGOMERY and JACOBS, JJ., concur in this result.