POMEROY, Justice.
These consolidated cases are before us on report pursuant to Rule 72(b), Maine Rules of Civil Procedure.
The Agreed Statement describes the issues presented as follows:
“1. Whether the offense for which g**** g**** and L**** B**** were adjudged juvenile offenders is unconstitutionally vague, and thus, their commitments are in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 1, § 6-A of the Maine Constitution.
“2. Whether S**** S**** and L**** B**** were adjudged juvenile offenders in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 1, § 6-A of the Maine Constitution, insofar as the conduct upon which the judgment of the Juvenile Court rested would not have been a criminal offense if committed by an adult.
“3. Whether S**** S**** and L**** B**** were adjudged juvenile offenders in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, § 6-A of the Maine Constitution insofar as the conduct upon which the judgment of the Juvenile Court rested would not have been a criminal offense if committed by an adult.”
This Court is charged by the rule with rendering such decision as the rights of the party require.
Both cases originated by the filing of a petition for a writ of habeas corpus (post-conviction) .
We note from the pleadings that both petitioners were adjudged juvenile offenders in the Juvenile Court on the basis of a petition which alleged in each case the petitioners were juveniles within the meaning of 15 M.R.S.A. 2502-(4).
The petition alleged in each case the juvenile was “living in circumstances of manifest danger of falling into habits of vice or immorality.” No other material circumstances of the cases are presented in the record before us. We are not informed by the record exactly what conduct of the juveniles was alleged in the petitions as supporting the conclusory allegation. Suffice- it to say the cases as *562 presented to this Court raise no issue as to the legal sufficiency of the petitions.
We are confronted then with a facial attack on the constitutionality of 15 M.R.S. A. 2552 insofar as it purports to give jurisdiction to juvenile courts to treat as a juvenile offender, a juvenile whose conduct is described therein as “living in circumstances of manifest danger of falling into habits of vice or immorality.”
The petitioners argue the reference section of the statute is unconstitutionally vague. The briefs filed on behalf of the petitioners equate the reference language to that found unconstitutionally vague in Knowlton v. State, Me., 257 A.2d 409 (1969) and in State v. Aucoin, Me., 278 A.2d 395 (1971).
The arguments advanced prompt us to reexamine our juvenile law system.
The social problem created by the conduct of the deviant child, i. e., a child whose conduct is antisocial, is not a problem which has come into being this year or this decade or even this century. It has existed in this country since our beginning days and has occupied the attention of jurists and sociologists perhaps more than any other single problem.
Most textwriters agree the opening of the New York House of Refuge in 1825 was the first great event in child welfare appearing before the Civil War. Schneider, The History of Public Welfare in New York State 1609-1866 at 317 (1938).
In 1839 the Supreme Court of Pennsylvania had before it a habeas corpus petition directed to the keeper and managers of the "House of Refuge” brought on behalf of one Mary Ann Crouse, a juvenile, alleging that she was unlawfully detained in that institution. The Crouse girl had been committed to the "House of Refuge” by a Justice of the Peace Court on the basis of a complaint signed by the child’s mother that,
“The said infant by reason of vicious conduct has rendered her control beyond the power of the said complainant and made it manifestly requisite that from regard to the moral and future welfare of the said infant she should be placed under the guardianship of the House of Refuge.”
The constitutionality of the statute authorizing the Court’s action was attacked. The Per Curiam opinion of the Court Ex parte Crouse, 4 Wharton 9 (Pa. 1839) held the statute constitutional. The rationale for such conclusion was as follows:
“The House of Refuge is not a prison, but a school. Where reformation, and not punishment, is the end, it may indeed be used as a prison for juvenile convicts who would else be committed to a common gaol; and in respect to these, the constitutionality of the act which incorporated it, stands clear of controversy. It is only in respect of the application of its discipline to subjects admitted on the order of the court, a magistrate or the manager of the Almshouse, that a doubt is entertained. The object of the charity is reformation, by training its inmates to industry; by imbuing their minds with principles of morality and religion; by furnishing them with means to earn a living; and, above all, by separating them from the corrupting influence of improper associates. To this end may not the natural parents, when unequal to the task of education, or unworthy of it, be superseded by the parens patriae, or common guardian of the community?”
The Court’s opinion concluded with this statement:
“The infant has been snatched from a course which must have ended in confirmed depravity; and, not only is the restraint of her person lawful, but it would be an act of extreme cruelty to release her from it.”
Thus, the parens patriae concept became imbedded in the law as justification for the use of State power to remove children from the environment in which they were *563 found and place them in an environment chosen by the State.
In 1899 the first Juvenile Court was established in the State of Illinois by the Act of April 21, 1899. 1899 Ill.Laws 131. Other juvenile courts followed.
The Pennsylvania statute of 1903 (1903 P.L. 274), was examined as to its constitutionality by the Supreme Court of Pennsylvania in Commonwealth v. Fisher, 213 Pa. 48, 62 A. 198 (1905). That statute which followed generally the pattern established by the Illinois Act, was attacked because:
(a) under its provision the defendant was not taken into court by due process of law,
(b) he was denied his right of trial before a jury on a charge of the felony on which he had been arrested, and
(c) the act provides different punishments for the same offense by the classification of individuals according to age.
Other reasons for the claimed unconstitutionality were advanced but these are not of concern here.
That Court treated with the objections raised as follows:
“The objection that ‘the act offends against a constitutional provision in creating, by its terms, different punishments for the same offense by a classification of individuals,’ overlooks the fact, hereafter to be noticed, that it is not for the punishment of offenders but for the salvation of children, and points out the way by which the state undertakes to save, not particular children of a special class, but all children under a certain age, whose salvation may become the duty of the state, in the absence of proper parental care or disregard of it by wayward children. No child under the age of 16 years is excluded from its beneficent provisions. Its protecting arm is for all who have not attained that age and who may need its protection. It is for all children of the same class. That minors may be classified for their best interests and the public welfare has never been questioned in the legislation relating to them. Under the act of 1887, the classification of females under 16 years of age means felonious rape, with its severe penalties for what may be done one day, though on the next it remains simple fornication, to be expiated by a mere fine. Other acts forbid the employment of minors under 12 years of age in mills; of any boy under 14, or any female, in anthracite coal mines; of minors under 14 in and about elevators; of a boy under 12, or any female, in bituminous coal mines. Others make it a misdemeanor to furnish intoxicating drinks, by sale, gift, or otherwise, to one under 21, and forbid the admission of any minor into certain places of amusement. Such classification is not prohibited by the Constitution, and what has not been therein prohibited the Legislature may enact.”
As to the due process claim, the Court said:
“In pressing the objection that the appellant was not taken into custody by due process of law, the assumption, running through the entire argument of the appellant, is continued that the proceedings of the act of 1903 are of a criminal nature for the punishment of offenders for crimes committed, and that the appellant was so punished. But he was not, and he could not have been without due process of law; for the constitutional guaranty is that no one charged with a criminal offense shall be deprived of life, liberty, or property without due process of law. To save a child from becoming a criminal, or from continuing in a career of crime, to end in maturer years in public punishment and disgrace, the Legislature surely may provide for the salvation of such a child, if its parents or guardian be unable or unwilling to do so, by bringing it into one of the courts of the state without any process *564 at all, for the purpose of subjecting it to the state’s guardianship and protection. The natural parent needs no process to temporarily deprive his child of its liberty by confining it in his own home, to save it and to shield it from the consequences of persistence in a career of waywardness; nor is the state, when compelled, as parens patriae, to take the place of the father for the same purpose, required to adopt any process as a means of placing its hands upon the child to lead it into one of its courts. When the child gets there, and the court, with the power to save it, determines on its salvation, and not its punishment, it is immaterial how it got there. The act simply provides how children who ought to be saved may reach the court to be saved. If experience should show that there ought to be other ways for it to get there, the Legislature can, and undoubtedly will, adopt them, and they will never be regarded as undue processes for depriving a child of its liberty or property as a penalty for crime committed.” [1]
In answering the final objection the Court in Fisher said:
“The last reason to be noticed why the act should be declared unconstitutional is that it denies the appellant a trial by jury. Here again is the fallacy that he was tried by the court for any offense. ‘The right of trial by jury shall remain inviolate,’ are the words of the Bill of Rights, and no act of the Legislature can deny this right to any citizen, young or old, minor or adult, if he is to be tried for a crime against the commonwealth. But there was no trial for any crime here, and the act is operative only when there is to be no trial. The very purpose of the act is to prevent a trial, though, if the welfare of the public require that the minor should be tried, power to try it is not taken away from the court of quarter sessions; for the eleventh section expressly provides that nothing in the preceding sections ‘shall be in derogation of the powers of the courts of quarter sessions and oyer and terminer to try, upon an indictment, any delinquent child, who, in due course, may be brought to trial.’ This section was entirely unnecessary, for without it a delinquent child can be tried only by a jury for a crime charged; but, as already stated, the act is not for the trial of a child charged with a crime, but is mercifully to save it from such an ordeal, with the prison or penitentiary in its wake, if the child’s own good and the best interests of the state justify such salvation. Whether the child deserves to be saved by the state is no more a question for a jury than whether the father, if able to save it, ought to save it. If the latter ought to save, but is powerless to do so, the former, by the act of 1903, undertakes the duty; and the Legislature, in directing how that duty is to be performed in a proper case, denies the child no right of a trial by a jury, for the simple reason that by the act it is not to be tried for anything. The court passes upon nothing but the propriety of an effort to save it, and, if a worthy subject for an effort of salvation, that effort is made in the way directed by the act. The act is but an exercise by the state of its supreme power over the welfare of its children, a power under which it can take a child from its father and let it go *565 where it will, without committing it to any guardianship or any institution, if the welfare of the child, taking its age into consideration, can be thus best promoted.”
Between Crouse and Commonwealth v. Fisher, supra, a telling assault was made on parens patriae in People ex rel. O’Connell v. Turner, 55 Ill. 280, 8 Am.Rep. 645 (1870). This case arose from a habeas corpus petition.
The impact of this decision on judicial attitudes concerning juvenile justice was relatively minor except in the State of Illinois.[2]
The O’Connell Court had said:
“The warrant of commitment does not indicate that the arrest was made for a criminal offense. Hence, we conclude that it was issued under the general grant of power, to arrest and confine for misfortune.” (Emphasis supplied)
Crouse had justified government custody of children on the basis that it was the responsibility of the state as parens patriae to treat antisocial conduct in children as an incipient social threat.
O’Connell treated antisocial behavior in children as a misfortune to be viewed as one of life’s cruelties visited upon children. That the child was taken into custody of the State and his liberty circumscribed by the State constituted impermissible restraint upon natural liberty and was forbidden by the Constitution.
Such a restraint on natural liberty, the O’Connell Court said, “is tyranny and oppression.”
The philosophy of the O’Connell Court is made manifest in a paragraph appearing at page 283 of the opinion in 55 Ill.,
“What is proper parental care? The best and kindest parents would differ, in the attempt to solve the question. No two scarcely agree; and when we consider the watchful supervision, which is so unremitting over the domestic affairs of others, the conclusion is forced upon us, that there is not a child in the land who could not be proved, by two or more witnesses, to be in this sad condition. Ignorance, idleness, vice, are relative terms. Ignorance is always preferable to error, but, at most, is only venial. It may be general or it may be limited. Though it is sometimes said, that ‘idleness is the parent of vice,’ yet the former may exist without the latter. It is strictly an abstinence from labor or employment. If the child perform all its duties to parents and to society, the State has no right to compel it to labor. Vice is a very comprehensive term. Acts, wholly innocent in the estimation of many good men, would, according to the code of ethics of others, show fearful depravity. What is the standard to be? What extent of enlightenment, what amount of industry, what degree of virtue, will save from the threatened imprisonment? In our solicitude to form youth for the duties of civil life, we should not forget the rights which inhere both in parents and children. The principle of the absorption of the child in, and its complete subjection to the despotism of, the State, is wholly inadmissible in the modern civilized world.”
It is by this language the predictive system which was the basis on which Crouse was decided, was rejected in O’Connell.
The first appearance of an attempt to deal with the juvenile problem separate from the criminal process in Maine, appears in Acts and Resolves of Maine, 1853, c. 19, bearing the title, An Act to Establish the State Reform School. Section 4 of the Act provided as follows:
“After proclamation shall have been made as provided in the third section of this act, when any boy or youth under *566 the age of eighteen years shall be convicted of any offense known to the laws of this state, and punishable by imprisonment, other than such as may be punished by imprisonment for life, the court, (or justice, as the case may be,) before whom such conviction shall be had, may at their discretion, sentence such boy or youth to the state reform school, or to such punishment as is now provided by law for the same offense. And if the sentence shall be to the reform school, then it shall be in the alternative, to the state reform school, or to such punishment as would have been awarded if this act had not been passed. Provided, however, that no justice of the peace shall sentence to the reform school for the offense of assault and battery.”
Later by Acts and Resolves of Maine, 1871-73, chap. 141, entitled An Act Relating to Maine Industrial School for Girls, the Legislature of Maine first used the phrase, “has been found in circumstances of manifest danger of falling into habits of vice or immorality.”
Section 1 of that Act provided as follows :
“A parent or guardian of any girl between the ages of seven and fifteen years, or the municipal officers or any three respectable inhabitants of any city or town where she may be found may complain in writing to the judge of probate or any trial justice in the county, or to the judge of the municipal or police court for the city or town, alleging that she is leading an idle, vagrant or vicious life, or has been found in circumstances of manifest danger of falling into habits of vice or immorality, and request that she may be committed to the guardianship of the Maine Industrial School for Girls. The judge or justice shall appoint a time and place of hearing, and order notice thereof to any person entitled 'to be heard, and at such time and place may examine into the truth of the allegations of said complaint, and if satisfactory evidence thereof is adduced and it appears that the welfare of such girl requires it, he may order her to be committed to the custody and guardianship of the officers of said school during her minority, unless sooner discharged by process of law.”
The Juvenile Court in Maine came into being by the provisions of chap. 241, Laws of Maine, 1931.
In 1939 by chap. 270, Laws of Maine, 1939, the Legislature provided for commitment of boys to the State School for Boys as well as girls to the Hallowell State School for Girls, when such boy or girl “has been found in circumstances of manifest danger of falling into habits of vice or immorality.”
In Wade v. Warden of State Prison, 145 Me. 120, 73 A.2d 128, (1950), this Court described the purpose of juvenile courts and laws relating to juvenile delinquency as follows:
“The purpose of juvenile courts, and laws relating to juvenile delinquency; is to carry out a modern method of dealing with youthful offenders, so that there may be no criminal record against immature youth to cause detrimental local gossip and future handicaps because of childhood errors and indiscretions, and also that the child who is not inclined to follow legal or moral patterns, may be guided or reformed to become, in his mature years, a useful citizen.
“The work of the judge of a municipal court, sitting as the judge of a juvenile court, is vitally important to the welfare of our state. He does not pass upon the crimes and misdemeanors of childhood wholly from the legal standpoint. The basic and primary idea of the legislature is salvation, not punishment. The nature of juvenile work is more philanthropic than the work of the common law jurist. The legislature of Maine has therefore placed this authority in the hands of men who know humanity and can inspire the *567 child with confidence and with a desire, in most instances, to become an upright citizen.”
Thus, it is clear Maine long has been one of the many states adhering to the predictive system first espoused in Crouse.
In 1967 the Supreme Court of the United States handed down what has come to be considered a landmark decision in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527. Basically, the holding in that case was that juveniles have the right to counsel at the adjudicatory phase of a juvenile proceeding.
As Mr. Justice Roberts said of it in writing for the Supreme Court of Pennsyl-ania in In re Terry and McKeiver, 438 Pa. 339, 265 A.2d 350 (1970):
“The decision is somewhat of a paradox, being both broad and narrow at the same time.”
The Court specifically enumerated as due process rights applicable to the adjudicatory stage of juvenile proceedings:
(a) Adequate and timely notice of charges;
(b) Right to counsel;
(c) Right to confrontation cross-examination, and
(d) Privilege against self-incrimination.
The petitioners in the case before us and many critics of Gault interpret Gault as the occasion for the demise of parens patriae,[3]
This widely held belief was strengthened by the decision of the Supreme Court in In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), which expressly held that proof beyond a reasonable doubt was required as a condition of adjudication that a juvenile is a juvenile offender. The narrow issue of that case was described by Mr. Justice Brennan writing for a majority of the Court when he said:
“This case presents the single, narrow question whether proof beyond a reasonable doubt is among the ‘essentials of due process and fair treatment’ required during the adjudicatory stage.when a juvenile is charged with an act which would constitute a crime if committed by an adult.”
The true meaning of Gault and Winship was described by the Supreme Court of the United States, speaking through Mr. Justice Blackmun in McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), as follows:
“The Court has refrained, in the cases heretofore decided, from taking the easy way with a flat holding that all rights constitutionally assured for the adult accused are to be imposed upon the state juvenile proceeding. What was done in Gault and in Winship is aptly described in Commonwealth v. Johnson, 211 Pa.Super. 62, 74, 234 A.2d 9, 15 (1967) :
‘It is clear to us that the Supreme Court has properly attempted to strike a judicious balance by injecting procedural orderliness into the juvenile court system. It is seeking to reverse the trend [pointed out in Kent [Kent v. United States] 383 U.S. 541 at 556, 86 S.Ct. 1045 at 1054, 16 L.Ed.2d 84 at 94] whereby “the child receives the worst of both worlds. . . ."'
“There is a possibility, at least, that the jury trial, if required as a matter of constitutional precept, will remake the juvenile proceeding into a fully adversary process and will put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding.”
The United States Supreme Court has thus made it abundantly clear that Maine *568 is free to pursue the course chartered so long ago in its resolution of the problem of juvenile deviants subject only to the requirement that due process he observed in all juvenile proceedings. We see nothing remarkable or new about this requirement. We had thought it long since established that the State in taking any State action is required to observe governmental fairness. See for example Kovack v. City of Waterville, 157 Me. 411, 422, 173 A.2d 554 (1961).
The petitioners here clearly equate due process requirements in juvenile proceedings with the well established due process requirements of criminal proceedings. With this contention we do not agree.
The petitioners further argue that because a juvenile proceeding can result in restrictions upon a juvenile’s liberty or even his loss of liberty, the conclusion is compelled that the due process requirements of criminal prosecution must apply. We answer this by saying it is not every loss of liberty which gives rise to an application of the standards of due process required in criminal proceedings. Just as the natural parent may constitutionally place limitation on the child’s freedom of locomotion and may substitute the will and judgment of the parent for that of the child and thus constrain the child’s will for his own protection, so also may the State in the exercise of its parens patriae guardianship. The juvenile proceeding is not a criminal proceeding. Its purpose is not punishment. “The basic and primary idea of the legislature is salvation, not punishment.” Wade v. Warden of State Prison, supra.
It, therefore, follows that the due process requirements of the Constitution must be equated to this sui generis proceeding and not to a criminal proceeding.
The statute with which we are here concerned calls for the protective facilities of the State to come into play whenever a juvenile, as defined by the Act, commits an offense and whenever the conduct of the juvenile is such that he or she is living in circumstances of manifest danger of falling into habits of vice or immorality. The statute does not relate to a status. By its express terms it relates to conduct of the juvenile. It treats with a class of persons, i. e., a person under the age of 17 in whom the State has asserted a special protective interest with constitutional validity.
The statute is unconstitutionally vague on its face even if the strictest standard applicable to criminal proceedings were to be followed only if when considering this limited class of persons, i. e., persons under the age of 17, men and women of common intelligence can only guess as to its meaning. The due process clause of the Constitution does not permit legislation which purports to regulate human conduct with sanctions imposed for violation to stand as valid if “men of common intelligence must necessarily guess at its meaning.” Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).
If no standard of conduct is specified at all, legislation is unconstitutionally vague. It is valid legislation, however, if it requires a person to conform his conduct to an imprecise but comprehensible normative standard. Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).
We conclude that when applied to this class, the language of the statute is sufficiently definite to withstand constitutional attack on grounds of vagueness.
The meaning of the reference phrase becomes clear when one considers the history and purpose of our juvenile laws. The basic purpose of affording juveniles special treatment is that the State as parens pa-triae has a duty to avoid giving children criminal records and, insofar as possible, prepare the child to cope with life and not become a criminal in his adult years.
*569 The Legislature accords special treatment to those juveniles whose conduct would be criminal if done by an adult, and based on the predictive concept, offers its preventive and corrective facilities to those juveniles whose conduct, if unchanged, is likely to become criminal when the child "becomes an adult. Thus, the conduct of a juvenile which constitutes living in circumstances of manifest danger of falling into habits of vice or immorality means conduct of the juvenile while living in circumstances which make it clear that if such conduct is continued, there is manifest danger of falling into habits of criminal conduct — such conduct being considered vice and immorality.
The terms vice or immorality mean those vices and those immoral acts which are defined by statute as criminal and the constituent elements of which are clearly described in the statute and in the case law interpreting the statute or by common law definition.[4]
Stated simply, the judgment which must be made by the juvenile judge is: On the basis of the allegations of the petition and the facts presented in support thereof, has the juvenile demonstrated a pattern of conduct which manifests or makes clear to all reasonable men that if persisted in and not changed, there is real danger that the conduct will, when the child becomes an adult, bring about violation of the criminal statutes ?
The proceedings must be initiated by the filing of a verified petition which must contain a “plain statement of the facts which bring the juvenile complained against within chapters 401 to 409.” (15 M.R.S.A. 2602) [5]
Thus, it may be said the petition must state facts demonstrating that the juvenile’s conduct constitutes “living in circumstances of manifest danger of falling into habits of vice or immorality.”
Appeal procedure is provided by the statute: The sufficiency of the allegations of the petition to establish that the conduct is, in fact, “living in circumstances of manifest danger of falling into habits of vice or immorality” is easily tested by reference to the facts alleged in the petition.
*570 The petitioners’ complaint that there is denial of equal protection of the law because the conduct sufficient to bring the juvenile within the ambit of the juvenile statute would not have been a criminal offense, if committed by an adult, is answered by pointing out that the child is not charged with criminal conduct.
The statute merely provides that the protective custody of the State shall come into play whenever there is conduct manifesting a danger that if persisted in, it will become criminal when the child becomes an adult.
Much of the petitioners’ brief is dedicated to an attempt to demonstrate that the predictive system has failed and as Mr. Justice Fortas said in Gault, the child winds up with the worst of two worlds. We concede that the statistics cited in Gault make a powerful case for the conclusion that the juvenile offender system has been neither well funded nor well administered. Despite this impressive documentation, our faith in the soundness of the predictive system is not shaken. We think no reasonable man would shoot a sound horse because his saddle stirrup needs repairs. The only alternative it seems to us would be to take what Mr. Justice Blackmun described as the easy way and to flatly hold the full scope of rights constitutionally assured for the adult accused in criminal proceedings are to be imposed on this State’s juvenile proceedings. This would be overlooking the difference in substance as well as procedure in the two. In fact, the criteria for determining due process requirements of non-criminal proceedings by the State are the same for children as for adults.
We fear, should deviant children be diverted to the criminal processes, great social harm would result.
By the Act of 1854 (Acts and Resolves of Maine 1853) and by the Act of 1931 (Laws of Maine 1931, chap. 241) Maine embarked upon a humanitarian program designed to save deviant children from a life of adult lawlessness. To make the program feasible it required children to give up some rights they had formerly enjoyed when they were treated through the criminal process. Thus, the State by law committed itself to
. . carry out a modern method of dealing with youthful offenders, so that there may be no criminal record against immature youth to cause detrimental local gossip and future handicaps because of childhood errors ■ and indiscretions, and also that the child who is not inclined to follow legal or moral patterns, may be guided or reformed to become, in his mature years, a useful citizen.” Wade v. Warden, supra.
To divert children back into the stream of criminal process would surely result in restoration of all the constitutional safeguards accorded adult criminals, but we fear it would have the effect of diverting public attitudes from the humanitarian goal of providing a helping hand to the deviant young.[6]
*571 We have the same sentiments as those expressed by Mr. Justice Roberts speaking for the Pennsylvania Court in In re Terry, supra.
We are confident that a properly structured and fairly administered juvenile court system can serve our needs without infringing on individual freedoms. The time may come when we are disabused of our belief that the potential for growth inherent in the juvenile system cannot be ignored.
That time has not yet come.
This facial attack on this statute must fail.
The entry must be,
Writ of Habeas Corpus denied in both cases.

. To the extent that this language may be interpreted as categorically denying the juvenile all due process protection as he proceeds through the juvenile system, it has clearly been discredited by the subsequent development of the 14th Amendment. The due process clause undebat-ably affords procedural protection in many non-criminal proceedings, juvenile proceedings among them; the modern dispute foeuses on the nature rather than the applicability of that protection. Moreover, the parallel between the role of the natural parent and that of the state as parens patriae is overdrawn by this court; the State’s power to deal with the juvenile is subject to the restrictions of the 14th Amendment, whereas the parent’s is not.

. The attitudes of the Court in O’Connell were effectively discarded in In re Ferrier, 103 Ill. 367, 42 Am.Rep. 10 (1882).

. See for example McKeiver v. Pennsylvania: Juries and Juveniles — Parens Patriae Revived, 5 Indiana Legal Forum 197 (Fall 1971).

. We recognize a statute couched in these terms presents danger of overbroad application. Even though as we have pointed out the core meaning describes a comprehensive normative standard, though imprecise at the periphery, there is danger that the complainant or the juvenile judge might attempt to apply his own particular moral standards or to force lifestyle or physical appearance into a mold he considers acceptable. In short, statutes framed as imprecisely as this appears to be, do create possibilities of attempted overbroad application. We are here faced, however, with a facial attack on the statute not an “as applied” attack. See United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). See also Coates v. Cincinnati, supra.
“Although a statute may be neither vague, overbroad, nor otherwise invalid as applied to the conduct charged against a particular defendant, he is permitted to raise its vagueness or unconstitutional overbreadth as applied to others. And if the law is found deficient in one of these respects, it may not be applied to him either, until and unless a satisfactory limiting construction is placed on the statute .... The statute, in effect, is stricken down on its face. This result is deemed justified since the otherwise continued existence of the statute in un-narrowed form would tend to suppress constitutionally protected rights.” 402 U.S. at 619, 91 S.Ct. at 1691 (White, J., dissenting) (1971). Mr. Justice White would permit an overbreadth attack to be made even though the “as applied” application presents no vagueness issue when the statute at issue purports to regulate or proscribe rights of speech or press protected by the First Amendment. See opinion of Coffin, C. J., in Goguen v. Smith, 471 F.2d 88 (1st Cir. 1972).

. There is no claim by these petitioners that the statement of facts in these cases (not found in this record) were insufficient to give them adequate notice of the conduct which the State contended constituted the commission of the juvenile offenses.

. A theme of paternalism and benign motivation permeates the history and present posture of the juvenile system. This requires special comment of a cautionary nature. It is not the motivation of the State in this area which justifies the application of non-criminal standards of due process, but it is, rather, recognition of the Legislature’s right to establish a separate and non-criminal system for juveniles. The Court is not and must not be beguiled by the commendable intentions of the State but must, because of them, all the more diligently scrutinize the separate system established to insure that it contains the safeguards necessary to protect the rights of the individual juvenile from abuse. As Justice Bran-déis said, dissenting in Olmstead v. United States, 277 U.S. 438, 479, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1927) “Experience should teach us to be most on our guard to protect liberty when the government’s purposes are beneficient . . The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.” A similar idea was expressed by two *571 dissenting justices in Wyman v. James, 400 U.S. 309, 343, 91 S.Ct. 381, 400, 27 L.Ed.2d 408 (1971). (Marshall and Brennan, JJ., dissenting) : “A paternalistic notion that a complaining citizen’s constitutional rights can be violated so long as the State is somehow helping him is alien to our Nation’s philosophy.” These words of caution must be considered in evaluating the holding in the instant ease and in dealing with future problems which arise out of the juvenile system.